Our final case for argument is 24-1197, Chateau Lynch-Bages v. Chateau Angelus. Mr. Colfer, will you please proceed? May it please the Court, I am appearing for the Chateau Lynch-Bages, the Appellant and Opposer. And if I may, I will refer to the parties as Opposer and Applicant as below. This case should have been a garden-variety case of likelihood of confusion using this Court's precedence. First, when the goods are identical, less similarity is needed in the marks. Second, when the leading words or components are identical, or nearly so, it takes less to establish a likelihood of confusion, less similarity when you have the leading components the same. Instead of that garden-variety likelihood of confusion case, the Board strayed far off the normal path and into something different in error. The Board permeated its finding of dissimilarity in the two respective marks. And third, that error was used to outweigh all the other factors that favored Opposer. But didn't the Board, I know the Board talked about house marks and how it combined the word echo with house marks, but at the end of the day, the Board did compare the two marks and determine that the word echo didn't add much. And the second part of the mark were distinctive enough that even though they both began with echo, there was not a likelihood of confusion. Isn't that what the Board said? I mean, I know the Board talked about house marks, but wasn't that really a side point? Not at all. They made it quite clear they used the word significantly. And then they went out of their way to look at four other cases dealing with dual house marks. They didn't go back to look at normal likelihood of confusion at all. They went off in the woods to find these new cases to support this theory of dueling house marks. But the Board says, doesn't it, bringing all the foregoing principles and observations together, the marks lead with the identical term echo, which contributes to a similarity in appearance. So far, so good. Sound and connotation. But the house marks are visually and orally different. So isn't the Court comparing the two marks there? I mean, that analysis there, if we had never heard anything about house marks at all, wouldn't that be enough to sustain the Board's decision? One sentence against pages that they wrote about house marks? I don't think so. I mean, they really went out of their way to emphasize house marks when the parties did not submit any evidence or arguments. It was a complete surprise that the rest of this case are house marks. And they never took on the problem of, because they like, the Board like to say, your translation makes it more likely there's a house mark because it's echo of. But they never took on the case of people who don't translate the mark. Just look at it. It's echo followed by some seemingly foreign sounding words that a lot of people wouldn't understand. Because people are used to buying wines from Europe, and they're used to seeing words that they don't understand. So that's not unusual. People won't bother to translate it, particularly non-French speakers. And the question is, ultimately, is there an appreciable number of consumers who could be confused? I think it's easy to conclude that there is an appreciable number of consumers who would not translate this. And they would just take it as echo of some foreign words. Following up on Judge Scarzi's question, how do we know that the Board relied on house marks to such an extent that it leads to some form of reversible error or need to vacate remand? What, pointing to us in the actual record of the opinion, what in the opinion shows us that it was such an error that leads to a reversal or a vacating remand on that ground? I think, as I said, the way they emphasized it, they went out and found four other cases that they said on their own, they said, we have no precedent. The Federal Circuit has no precedent, or its predecessor. We've got to go out and look at infringement law. But in the opinion, at appendix page 25, the last sentence at the bottom, bridging 25, 26, moreover, the use of echo with D apostrophe and DE, followed by the party's house marks, contributes significantly to the overall commercial impression of the marks as invoking the respective house marks. The sentence is almost redundant. It says, if you have house marks, it's significant in creating a commercial impression of house marks. I think that, look, I agree with you. I think that their utilization of this house mark concept is problematic. But the word moreover is the kind of thing that we usually use, you know, we've already decided something. Moreover, and then you go that additional step. And so, I think I'm following up now on Judge Garzi's excellent question about how I get that there's a bunch of house mark stuff in here, and I also get your problems with it. But I'm just wondering if that first part of the conclusion, which is where they actually are telling us what they're deciding on similarity and why, I'm wondering if it doesn't stand alone. I realize it's only a couple of sentences compared to pages of house mark discussion. I get that. But bringing all the legal guidance and observations together, and then it goes on to say they leave with these identical terms, echo, but the remainder of the marks are visually and orally different. And they say echo has conceptual weakness. I'm just, if that had been the only thing in this opinion, I would for sure be affirming on this point. And so, I kind of am wondering if it doesn't stand alone to justify their decision. And the moreover isn't, moreover, there's also these additional reasons that lend to the conclusion we've already reached. Go ahead. No, please. Go ahead. Oh, no. Are you referring to the part in appendix 26? I'm on page 25. Appendix 25. Everything else, the preceding paragraphs are all just discussion of house mark cases, but they don't seem to actually conclude something that matters in this case. Then they say, bringing all the foregoing legal guidance, observations together, the marks leave with identical terms, echo, which contribute to similarity and sound and connotation. Yep, that seems like a reasonable fact finding. But the remainder of the marks are visually and orally different. That also seems like a reasonable fact finding to me. So, what is the problem with that? It's outweighed by the pages of analysis of house marks. And twice the board labeled this case as unusual. I mean, that's an odd step to say, this is an unusual case. We've never had any circumstances like this. We're going to go look at a whole body of law that we've never examined before. And you're saying that that's outweighed by one sentence of a perfunctory statement that the marks are different? Respectfully, the one sentence seems to say all it needs to. I don't think these marks are at all similar in appearance, sound, or connotation either. And so I think that that is the test that's supposed to be done for similarity of marks. And it seems like they did it. And honestly, if we give you a vacate and remand on this rhetoric in the opinion about house marks that probably ought not to be here, your client is no better off. He's just going to spend more money on his lawyer arguing. But at the end of the day, the case is going to come out the same way. Because these marks are not similar. That's all there is to it. They're not similar. The board is correct in finding they're not similar. I find they're not similar de novo. But that's not even my standard of review. My standard of review is substantial evidence because it's a fact finding. So, I don't think that that rhetoric about house marks helps your client at the end of the day. Because even if we vacate and remand, if you convince us that that infected this decision and it's wrong, you're still going to lose on remand. And your client's just going to spend more money on his lawyer. That's all that's going to happen. That wasn't really a question. I mean, I don't know what you're going to say in response to it. It seems to me difficult to say that there's no similarity when I, as I said, the two basic precepts. When the goods are identical, less similarity is needed. Second, when the leading components are the same, it increases the likelihood of confusion. This court has issued dozens of cases on each one of those principles. And now you're saying, well, it doesn't really matter in this case. Because the second words are different. To get back to the Chief's point, though, if you look at the page 25, that first sentence is a finding by the board. That finding by the board is sufficient for the board to base its decision on, regardless of the detour with housemarks. What's the argument that if this got sent back to the board, the board wouldn't say the exact same thing as it said in the first sentence of the bottom paragraph on page 25? That sentence, those two sentences, say nothing about housemarks. They actually do appropriate analysis of the and they ignored what consumers would actually see, the marks as they are. The consumers would not see these as housemarks. I guess I'm pointing to this section of 25 that doesn't talk about housemarks. Why wouldn't the board just say the same thing? Or it could just literally go through its opinion and cross out all the housemark analysis and provide this. That would be a sufficient opinion of the board, which we'd have to. But the board didn't do that. If they weighed the principles that I just said, the two major principles that this court has enunciated, to me, they should have found likelihood of confusion. I think this decision is just infested with this housemark analysis. I mean, there's pages of it. And then for it to be saved by one sentence, where they say, overall, there's a difference. But you also agree that there's other analysis beyond the housemark analysis in the actual opinion itself. Of the similarity of the marks? Because the other factors weren't in opposers' favor. Other analysis of the similarity of marks, the board is just wrong. Sometimes they just stated false things. It stated that Lynch-Baget was a housemark for opposers' premium wine. That's false. We do not have a registration of Lynch-Baget. It emphasizes that the wine is called a second wine. No consumer is going to know that. It's a matter of marketing. No one's going to label the product second wine, because everyone wants the first wine. And they relied on things that were just either false or completely unrelated to what they were doing. And they just never really approached it from the view of an ordinary consumer. This is like a legal analysis in the back room, where they take apart the record and go hopping through it, trying to support a housemark theory. Well, if you just look at the opinion itself, right, if we're looking at it, and you want to focus on the similarities and dissimilarities of the marks section, right? So appendix pages at least 20 through the top of 22 are not focused on the housemark analysis, correct? Yeah, that's mostly standard, reciting the standard law in the opening paragraph. And then they say it begins with the word echo. I mean, they really don't get to it until page 22, first full paragraph at the end. It appears that Angelus and Lynch-Baget are the party's housemarks. How does it appear? I mean, what they cite after that is either flimsy evidence, incorrect evidence, or just assumptions. They've already made up their mind that it's housemarks. And I mean, I just note also that when they weighed the relevant factors on page 26, they basically said, look, the goods are identical in part, channels of trade are not limited, so presumed identical, class of customers presumed identical. And then it says, but weighing against a conclusion that confusion is likely, the fact that dissimilarities between the marks outweigh the similarities. They don't say anything about housemarks. Like in their conclusion, they don't say anything. They don't seem to be saying because of these housemarks. They don't put any of their ultimate weighing on anything related to the housemarks. They didn't have to, because for four complete pages, they explain the dissimilarities in terms of housemarks. When they use it in one sentence on page 26, it's with an understanding that you know what we mean by dissimilarities. It's because they have different housemarks. They didn't have to stress it. Why do we say press your time for rebuttal? Let's go ahead and hear from opposing counsel. Good morning, Your Honors. Mr. Brzezina? David Brzezina for Appellee Chateau Angeles. May I please report? The board is correct in finding the dominant components of the marks show no likelihood of confusion. There is ample evidence of that. I mean, the problem is this housemark analysis is just not right. What do we do about that? You can't convince me it was right. Your only chance is to convince me it's harmless error. At least for me. I don't want to speak for everybody. That's for me where I am. Can you try to convince me it's harmless error? If we edited the decision to substitute dominant terms, it would be substantially elimination of housemarks. I missed that. Could you maybe try that one again? If we took out those four pages about housemarks, the dominant terms remain Lynch, Bage, and Angeles. It doesn't matter if you label them housemarks, which in a trademark law class, I might say housemark would be separate. But here it is the dominant term pointed to by echo day or day. Where did it say that dominant term thing in the board's opinion? Where did it say that the word echo or the dominant terms? Dominant may have been my language, but it is the term. No, but that would be important. What you just said would be great. That's in the opinion. I think that you are much stronger. So is it in the opinion? Did the board actually make a finding about what the dominant terms were in the mark? I don't recall that they used the word dominant. I expect that that's my argument that that's what they meant when they called them housemarks. But Opposer admits in their interrogatory answer that echo the Lynch-Bage. Lynch-Bage is the name of their Grand Cru wine, and echo day naturally follows. That's in their, they admitted it in their interrogatory answer. Which I agree that all this housemark analysis is just really misplaced because there wasn't evidence in the record that these are housemarks as housemarks are commonly understood. I would say that is a correct statement. And so isn't the question for us as to whether or not this analysis of housemarks somehow improperly affected the board's decision and therefore should be sent back to the board with instructions to do it again without the housemark analysis? It is whether the inclusion of that terminology is an error of law. And if there is substantial evidence like the admissions that emphasize that Lynch-Bage and Angelus are terms important enough to find no likelihood of confusion, then the decision should be affirmed. Well, but that last part, I don't see that in here. That's what I'm looking for. I want that to be here, and I personally believe it, but I don't see it, and we can't replace the board's analysis under Chenery with our own thinking about how we can come to the same outcome. We are required to only pass upon what the board actually stated was its reasons, and I don't see that in here, and that's what's bothering me. I'll be honest, I kind of agree with you on the outcome, but I don't think that my personal view is how the case gets decided. It's got to be whether the board reached it and whether I can affirm on the basis they chose. Well, the board had evidence of the Chateau-Lynch-Bage registrations. With Lynch-Bage as the distinctive term, Chateau is not distinctive, they had the admissions by Chateau-Lynch-Bage that the whole point of ECHO the Lynch-Bage was to point through the ground through, and it is a secondary one, second one. What is your best legal support for how this court could affirm despite the housemark analysis? If you look at the marks as a whole, the primary line names are very different. The marks as a whole are different. They didn't need to discuss housemark as a label. They could have just said ECHO of points to, as is admitted, another label, another brand, and we find that that pointing to is enough to emphasize the words Lynch-Bage and Angelus. The marks are different if you consider them as a whole, which they must do. I know, but the problem is we don't get to do that, like that isn't how it works. We don't have to know the review over this, and we don't get to render an analysis, even if the record supports it, that differs from what the board articulated. You're familiar with Chenery, right? This isn't like a jury trial where we look to see if there's substantial evidence in the record for a black box verdict. We have a particular line of analysis, and we have no choice but to simply decide whether that articulated line of analysis is correct or not. Let me take you back to page 25 in the appendix. We're looking at the board's decision, the bottom paragraph, and that first sentence. I'm sorry, the first two sentences. Bring all the foregoing legal principles, I'm sorry, guidelines and observations together. The marks leave with the identical term ECHO, which contributes to a similarity in appearance, sound and connotation, but the remainder of the marks are visually and orally different. Is that enough to affirm this decision, or does there need to be more? As a finding, that is enough. Why is that enough? Because there is evidence, ample evidence, consistent with that. And so are you saying it's enough because the board points out that the marks are visually and orally different? That is a valid conclusion. So the court's making a finding that the marks are visually different, and they also sound different. Yes. And in there, it's focusing on the second part of the marks. Those are the differences. Does the use of ECHO in the other registrations that you submitted help you? It emphasizes there is ample evidence of both Lynch-Baget and Angeles as recognizable, distinctive terms. And ECHO of points to a primary line. It is a second line. But in other words, you submitted registrations to the board of the use of ECHO in a variety of different contexts. ECHO Peak, ECHO Falls, ECHO Bay, and so on. And the board found then that these registrations reflect that ECHO is a fairly common chosen term in the field. And so did that aid the board in its determination that ECHO wasn't a particularly dominant or important part of these marks? Yes. The board used the presence of third party registrations to interpret the meaning of the words. ECHO is not particularly distinctive. The other components are distinctive and are enough to be weighed to find they control the decision on likelihood of confusion. Can you turn to appendix page 26? This is where, this is the board's decision. Yes, ma'am. Tell me when you have it handy. You got it? Yes. All right. So I'm looking at that last sentence, which it looks to me to be the fact finding, right? This is a fact finding on similarity. The board has an obligation to do the facts and the facts. The question is, how similar are the marks? That's what this first factor is, right? How similar the marks are. Is that right? Yes. So this is the fact finding. We think that in this unusual case where both parties' marks incorporate different appearing house marks as part of a unitary expression and where the common term between the marks is weak, the dissimilarities outweigh the similarities. So my problem, I 100% think that they did find the common term is weak. That word ECHO is weak. So that's a fact finding. But what they said in their fact finding on similarity with regard to the non-weak part is they just seem to hinge it on that house mark stuff. And I don't know what to make of that. Well, another point on the house marks is I can't tell you as a matter of law that what they call the Grand Cru marks are the ones at issue. I can't tell you those are not house marks. Usually, if this were a trademark law class, we might say house marks are often printed separately. But I can't say as a matter of law that a term commonly used in multiple marks by an applicant or registrant, I can't say as a matter of law that's not a house mark. The unusual case part of it is we don't have law that says they are not house marks. We also have law that talks about a family of marks, but that's to extend to a different mark. We've got law about unitary terms, but that doesn't apply with the logic of opposers that we should ignore the differences. They say only look to the first words and then stop. That's not an error of fact or law. We should not look at the first word and stop. This is the marks of the whole. The board did that. You call it a house mark. There's no law that says it's not a house mark. And when we consider the marks as a whole, they are very different. Let me point you back to that language that Chief Judge Moore asked you about. If we look at that sentence, we think that in this unusual case, the sentence goes through and kind of does some wind up, but that ends with the dissimilarities outweigh the similarities in the respective marks. Is that the finding? Yes. And what's the import then in this unusual case where both parties incorporate different appearing house marks as part of unitary expressions? What's the import of that? We don't have a definition of house marks as a matter of law. That's unusual. This is exactly a situation of a family of marks being projected. So if we take the term house marks and we define it as names of the parties, then everything follows. Then we're fine. The problem is when we look at house marks and try to put the trademark definition on it. And like those cases that the board cited where those were house marks, then we get into trouble. I'd say I would have preferred they had not used the terminology house marks. And if they use the term party's names, that would be fine. Party's names or again, the admission is, and the evidence shows, echo is a second line that's in their admission. And it's in our website, I think. It's in the record. So if there's a second line, they say it refers to their ground crew, which is their primary line name. So they admit echo refers to something else. And the board is eminently correct in concluding that something else that the second line includes is the term that is recognized. OK, counsel. Thank you so much. We'll hear from, you have two minutes for rebuttal, please. Mr. Culver. OK, two quick points. Just to reiterate what I said before, Lynch-Baget is not a registered mark for their wine. So it's totally unfair to say that we said that was a house mark. That's not in the record at all. Second, you cannot equate the party's names as house marks. I mean, the party's names are Chateau. That's not part of the mark at all to be compared. So it's not fair to dissect their company name and suddenly turn it into a house mark. OK, enough about house marks. Even if this case only went to remand, at page 9, I summed up some of the cases, page 9 of my brief, some of the cases where the leading word was the same and they found likelihood of confusion. And I think this case fits comfortably within that of echo, day. I mean, some of the cases are rain barrel and rain fresh, a gold strassum and gold schweiger. And also, I thought at page 11 was also a fitting case, the Sacato case, where the marks were Duca d'Aosta and Duca d'Arezzo. My apologies to the Italian language. And the board recognized that the two second words are Italian cities, but consumers are not going to know that. They're going to see the lead word followed by some foreign word. And that's what we've got here. I think the board could have easily concluded that there's a likelihood of confusion if it hadn't gone off on the wrong path. OK, I thank both counsel. This case is taken under submission.